UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BEHIJA KAHRIMAN                  )
                                 )
            Plaintiff,           )
                                 )      CIVIL ACTION NO.
v.                               )      12-11887-DPW
                                 )
WAL-MART STORES, INC.,           )
WAL-MART STORES EAST, L.P.,      )
and JOSEPH E. DEVUONO II,        )
                                 )
            Defendants.          )

MEMORANDUM AND ORDER
July 14, 2015

     This is an action alleging employment discrimination by

defendants Wal-Mart Stores, Inc., and Wal-Mart Stores East,

L.P., and by defendant Joseph E. Devuono II, the manager of a

Wal-Mart store in Lynn, Massachusetts.  The plaintiff, Behija

Kahriman, was employed in several roles at the Lynn store from

April 2002 until February 2010.  Kahriman alleges that the

defendants intentionally discriminated against her on the basis

of her handicap/physical disability in violation of state and

federal antidiscrimination laws, and further that Devuono

intentionally inflicted emotional distress upon her and

interfered with a contractual or advantageous business

relationship she had with Wal-Mart.[1]  Now before me is the

defendants' motion for partial summary judgment.

## I. BACKGROUND

### *A.  Factual Background*

#### 1.  Kahriman's Employment at Wal-Mart

Kahriman began working at the Wal-Mart store in Lynn,

Massachusetts (store number 2139, hereinafter "the Lynn store")

in April 2002.  Devuono began working for Wal-Mart in 2001 and

was Kahriman's supervisor and then store manager at the Lynn

store from at least January 1, 2009 to August 10, 2010.

Kahriman's first role at the Lynn store was as a cashier.

At the time, she understood that this position would require

some heavy lifting.  She became a sales floor associate in 2003

or early 2004.  An essential function of that position was

frequently lifting and carrying items weighing up to and greater

than 50 pounds, while moving up and down a ladder.  In November

2007, Kahriman was promoted to department manager of the men's

department.  An essential function of that position was

---

[1] The parties dispute whether the Lynn store was operated by –and
correspondingly whether Kahriman was an employee of –defendant
Wal-Mart Stores, Inc., or defendant Wal-Mart East, L.P.  Rather
than make this a dispute at issue in this case, the parties are
satisfied to proceed on the basis that the two named defendants
will be treated as potentially jointly and severally liable.
For simplicity, I will refer in this Memorandum to both
defendants jointly as "Wal-Mart."

constantly picking up, lifting, sorting, carrying, and placing items weighing up to 30 pounds without assistance and over 30 pounds with team lifting.  In February 2009, Kahriman became a manager of the apparel department.  Among the physical activities necessary to perform one or more essential functions of this position is moving merchandise and supplies weighing less than or equal to 25 pounds without assistance.  For each of these positions, Kahriman affirmed that she had "the ability to perform the essential functions of this position either with or without a reasonable accommodation."  Throughout her employment at Wal-Mart, Kahriman received positive evaluations and yearly raises.

During her employment at Wal-Mart, Kahriman experienced ongoing health issues that impacted her ability to perform the lifting duties of each of her positions.  In September 2002, she took a leave of absence to undergo abdominal hysterectomy surgery.  In a note to Wal-Mart on August 27, 2002, Kahriman's physician stated that Kahriman was scheduled for surgery and "should avoid any strenuous activity when she is experiencing pain."  When she returned to work after the surgery, Kahriman asked her supervisors for assistance with lifting, because her stomach muscles were weak and she experienced pain when

performing heavy lifting.  According to Kahriman, this assistance was not provided to her.[2]

After the 2002 surgery, Kahriman suffered recurring hernia issues.  When Kahriman was transferred to a sales associate position in the fabrics department in 2003 or early 2004, she did not make a formal request for accommodation, but she did request lifting assistance from her supervisors.  Again, by her own account, she was not provided with such assistance.

In May 2003, Kahriman underwent ventral hernia surgery. Kahriman's physician informed Wal-Mart that she should not lift more than 30 pounds upon her return to work.  Kahriman testified that her supervisors and the human resources personnel did not honor her requests for lifting assistance, despite this instruction from her physician.  In her role as a sales associate, Kahriman lifted boxes of merchandise for approximately one hour three times per week.  Kahriman testified that when she requested assistance with this task, her managers told her to punch out and find another job.

During the holiday season of 2005, Kahriman experienced recurring hernia issues, including pain when she lifted heavy

---

[2] There is some dispute in the record whether Kahriman's transfer to a sales associate position and her subsequent transfers were in response to her requests for a position without heavy lifting.

boxes, but was denied leave for hernia surgery.  In April 2006, Kahriman took a leave of absence for the surgery.  Following the surgery, her physician informed Wal-Mart that Kahriman should not lift more than 10 pounds.  Again, despite her physician's instruction, Kahriman's supervisors did not provide her with lifting assistance, and told her that if she could not perform the lifting duties, she should punch out and go home or find another job.

In November 2007, when Kahriman began working as a manager in the men's department, her supervisor promised her that she would have assistance with lifting boxes weighing up to 50 pounds at the start of her shift.  This assistance was rarely provided.  In November 2008, Kahriman's physician informed Wal-Mart that she could not lift or carry more than 20 pounds due to lower back pain.  In June 2009, following a short leave of absence for back issues, Kahriman informed the store manager, Devuono, that she had developed two ventral hernias and asked for lifting assistance at the start of her shift.  Her physician again instructed that she should not lift more than 20 pounds.

Kahriman's health issues at work escalated in September 2009.  On September 18, Kahriman's daughter advised Wal-Mart's Legal Department by letter that Kahriman and others had complaints about Devuono, and indicated specifically that when

5

Kahriman told Devuono that she could not lift something heavy due to her hernia, "he tells her that he doesn't really care and that if she wants her job to do what he tells her to do."  On September 23, 2009, when Kahriman arrived at work in the morning, Devuono instructed her to unload boxes from a pallet because Wal-Mart's president would be visiting that day. Kahriman said she could not do it because of the heavy lifting involved, but Devuono instructed her to unload the pallet without assistance, or to punch out and go home.  After completing the task, Kahriman felt stomach pains and could not stand.  That night, Kahriman went to the emergency room and learned that her "hernia came out."  She underwent surgery for these issues in October 2009.

Kahriman requested and received medical leave from September 23, 2009 through January 15, 2010.  She went in to the store on December 22, 2009 to file a report regarding her injuries on September 23, her last day of performing work.  In February 2010, Kahriman's primary care physician provided a note to Wal-Mart stating that Kahriman would be out of work "forever."  The note stated that Kahriman was "unable to work

period."[3]  Kahriman's last day of official employment with Wal-Mart was February 4, 2010.  According to Kahriman, Wal-Mart did not notify her that her employment was terminated; she learned about her termination through a notice from Merrill Lynch regarding one of her benefits in March 2010.

Although Kahriman testified that she understood Wal-Mart's accommodation policies – discussed in greater detail below – Kahriman never filed a formal request for an accommodation, because she was afraid she would be fired.  She did, however, inform her managers of her physical limitations and her inability to do heavy lifting.  Other than her lifting issues, Kahriman was able to perform the essential functions of each of her Wal-Mart jobs without assistance.

2.  Wal-Mart's Formal Policies

Several policies contained in the record that were in place during Kahriman's employment – and of particular pertinence to this case – are the Massachusetts Management Guidelines for Accommodation in Employment (Medical-Related) Policy (the "Management Accommodation Policy") and the Massachusetts Accommodation in Employment (Medical-Related) Policy (the

---

[3] Kahriman's doctors report that the lifting she performed at Wal-Mart was a cause of Kahriman's hernias in 2003, 2006, and 2009.

"Accommodation Policy").  Other policies in place during Kahriman's employment were the National Discrimination & Harassment Prevention Policy (the "Harassment Policy"), the National Open Door Communications Policy (the "Open Door Policy"), and the Associate Transfer Policy (the "Transfer Policy").

The Management Accommodation Policy sets forth the procedure to be used by supervisors and managers when an associate requests an accommodation.  Specifically, it outlines how to identify a request for accommodation, how to engage in the interactive process, and how to conclude the accommodation request process.

The Accommodation Policy states that "Wal-Mart will provide Associates who have a *disability* with reasonable accommodations to enable them to perform the essential functions of their jobs" and sets forth a variety of alternatives – including a job aid or environmental adjustment, a leave of absence, and transfer to another open position – for individuals who "have a *medical condition* that is not a disability" (emphasis in original).  The policy frequently references an employee's ability to request an accommodation and indicates that "[a]s soon as you request an accommodation, Wal-Mart will begin working with you to determine

whether or not you are eligible for a job aid or environmental adjustment due to your medical condition."

## B.   *Procedural History*

On June 18, 2010, Kahriman filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) and the United States Equal Employment Opportunity Commission (EEOC)[4] alleging that Wal-Mart Stores, Inc. and Devuono discriminated against her in violation of Mass Gen. Laws ch. 151B and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* Kahriman received a notice of right to sue letter from the EEOC and she in turn informed the MCAD that she intended to file an action in state superior court; the MCAD accordingly dismissed her complaint without prejudice.  Kahriman filed a complaint in the Essex County Superior Court on August 27, 2012.  The defendants removed the case to this court on the basis of federal question jurisdiction, 28 U.S.C. § 1331.

The complaint alleges that all of the defendants: (I) violated the Massachusetts Fair Employment Practices Law, Mass.

---

[4] Due to a "work-sharing" agreement between the MCAD and the EEOC, a charge filed with the MCAD is treated as filed with the EEOC simultaneously.  *See Leung* v. *Citizens Bank*, Civ. No. 12-11060-FDS, 2014 WL 1343271, at *3 (D. Mass. Apr. 2, 2014) (citing *Seery* v. *Biogen, Inc.*, 203 F. Supp. 2d 35, 43 (D. Mass. 2002); *Davis* v. *Lucent Techs., Inc.*, 251 F.3d 227, 230 n.1 (1st Cir. 2001)).

Gen. Laws ch. 151B §§ 1, 4, 4A, 5, 16, and 17; (II) violated the
Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*; and
(III) interfered with and denied Kahriman's state and federal
constitutional rights by threats, intimidation, or coercion, in
violation of Mass. Gen. Laws ch. 12, § 11I.  The complaint
asserts three additional counts against Defendant Devuono
individually: (IV) unlawful discrimination against Kahriman in
violation of Mass. Gen. Laws ch. 151B, §§ 4, 4A, & 5; (V)
intentional infliction of emotional distress; and (VI)
intentional interference with a contractual or advantageous
business relationship.  Finally, the complaint asserts one count
for injunctive relief against Wal-Mart (Count VII).  In addition
to declaratory and injunctive relief, Kahriman seeks
compensatory damages including for her physical and emotional
pain and suffering, back pay for lost wages and benefits,
interest on back pay, and front pay for future lost wages and
benefits; punitive damages; enhanced damages; attorneys' fees
and costs; and reinstatement to a position with a reasonable
accommodation.

## II. DISCUSSION

### A.   *Standard of Review*

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the moving party is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A "genuine" dispute is one that, based on the pleadings, discovery, and disclosure materials in the record, "a reasonable jury could resolve . . . in favor of the non-moving party," and a "material" fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation marks omitted). In considering the record, I view the facts "in the light most favorable to the non-moving party." *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999).

The defendants seek summary judgment on so much of Counts I, II, and IV of Kahriman's complaint as alleges discrimination under the ADA and/or chapter 151B for (1) events that occurred more than 300 days before Kahriman filed her charge of discrimination with the MCAD, and (2) Kahriman's formal termination from employment.

**B.  *Statute of Limitations***

The ADA adopts the procedural provisions governing Title VII, and as a result, the statutes and case law discussing the statute of limitations in the Title VII context are equally applicable here. *See Tobin* v. *Liberty Mut. Ins. Co.*, 553 F.3d 121, 130 n.7 (1st Cir. 2009). Under both Title VII and chapter

11

151B, a plaintiff must file an administrative complaint with the MCAD or the EEOC within 300 days of the date of the occurrence of the alleged unlawful employment practice.[5]  *See* 42 U.S.C. § 2000e-5(e)(1); Mass. Gen. Laws ch. 151B, § 5; *Tuli* v. *Brigham & Women's Hosp.*, 656 F.3d 33, 40 (1st Cir. 2011); *Ocean Spray Cranberries, Inc.* v. *Mass. Comm'n Against Discrimination*, 808 N.E.2d 257, 265-66 (Mass. 2004).  Kahriman filed her complaint with the MCAD on June 18, 2010.  Accordingly, she would ordinarily be barred from pursuing relief for any alleged acts of discrimination that occurred more than 300 days prior to that time (prior to August 22, 2009).

Kahriman seeks to invoke the continuing violation doctrine to preserve her claims for events that occurred before August 22, 2009.[6]  Under the continuing violation doctrine, "[a] party alleging employment discrimination may, in appropriate circumstances, file suit based on events that fall outside the

---

[5] Although the charge-filing period for Title VII claims is typically 180 days, it is extended to 300 days where the state anti-discrimination agency enforces a parallel state or local law, as the MCAD does.  *See* 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a); *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 110 (2002); *see also Williams* v. *City of Brockton*, 59 F. Supp. 3d 228, 245 (D. Mass. 2014).

[6] The continuing violation doctrine developed in the Title VII context, but it has been applied to ADA and chapter 151B claims as well.  *See Tobin* v. *Liberty Mut. Ins. Co.*, 553 F.3d 121, 130 n.7 (1st Cir. 2009); *Castro-Medina* v. *Procter & Gamble Comm. Co.*, 565 F. Supp. 2d 343, 373 (D.P.R. 2008).

applicable statutes of limitation." *Tobin*, 553 F.3d at 130. This doctrine effectively serves to renew untimely discrimination claims if a related act occurred within the limitations period. *See Davis* v. *Lucent Tech., Inc.*, 251 F.3d 227, 234 (1st Cir. 2001); *Ocean Spray*, 808 N.E.2d at 266-67. "Under this continuing violation doctrine, a plaintiff who ordinarily would be unable to recover damages for discrete acts of discrimination falling outside the limitations period may avoid that bar if those acts are shown to be part of a pattern of discrimination anchored by acts that occurred within the limitations period." *Noviello* v. *City of Boston*, 398 F.3d 76, 86 (1st Cir 2005) (citing *Cuddyer* v. *Stop & Shop Supermarket Co.*, 750 N.E.2d 928, 936 (Mass. 2001)).

The continuing violation doctrine can encompass two types of violations: serial and systemic.[7] *See Lawton* v. *State Mut.*

---

[7] Although the First Circuit has observed, based on the Supreme Court's decision in *National Railroad Passenger Corp.* v. *Morgan*, 536 U.S. 101, 118 (2002), that "it is no longer necessary for a jury to determine whether a violation is systemic or serial when considering the timeliness of a hostile work environment claim," *Crowley* v. *L.L. Bean, Inc.*, 303 F.3d 387, 406 (1st Cir. 2002), that change appears to be limited to claims alleging a hostile work environment. *See Arroyo-Audifred* v. *Verizon Wireless, Inc.*, 431 F. Supp. 2d 215, 218-19 (D.P.R. 2006). Recognition of the distinction seems to remain for the application of the continuing violation doctrine in other contexts. *See, e.g., Davila-Torres* v. *Feliciano-Torres*, 924 F. Supp. 2d 359, 367 (D.P.R. 2013).

*Life Assur. Co. of Am.*, 101 F.3d 218, 221 (1st Cir. 1996).  A systemic violation "need not involve an identifiable discrete act of discrimination transpiring within the limitation period," but instead involves a demonstration that the "plaintiff has been harmed by the application of a discriminatory *policy* or *practice* and that such policy continues into the limitations period."  *Muniz-Cabrero* v. *Ruiz*, 23 F.3d 607, 610 (1st Cir. 1994) (quoting *Jensen* v. *Frank*, 912 F.2d 517, 523 (1st Cir. 1990) (internal quotation marks omitted; emphasis in original)).  This type of claim arises in relation to "general practices or policies, such as hiring, promotion, training and compensation."  *Provencher* v. *CVS Pharm., Div. of Melville Corp.*, 145 F.3d 5, 14 (1st Cir. 1998).  Kahriman alleges a systemic violation based on Wal-Mart's "unlawful, discriminatory policies."  Where a plaintiff claims a systemic violation, she bears the burden of demonstrating that "a discernible discriminatory policy was in effect, and injured her, during the limitations period."  *Mack* v. *Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 184 (1st Cir. 1989).[8]

---

[8] Kahriman did not argue in her summary judgment briefing that her claims qualify as serial violations.  Even if she were to make this argument, however, it would be unpersuasive.  A serial violation is "composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate [actionable] wrong," but each act not itself "rising to the level of a recognizable injury."  *Muniz-Cabrero* v. *Ruiz*, 23 F.3d 607, 610 (1st Cir. 1994) (quoting

A brief explanation of what the law requires is necessary
in order to assess whether Kahriman has demonstrated that Wal-
Mart has a discriminatory policy.  As the First Circuit has
observed, the interactive process "is the first step in a proper
response to a disabled employee's request for reasonable
accommodation.  It is a means of ensuring that employers take
steps to understand and address their employees' disabilities."
*Tobin*, 433 F.3d at 108 n.7.  For this reason, the ADA and
chapter 151B require an employer to engage in an interactive
process or "meaningful dialogue with the employee" to determine
a reasonable accommodation once an employee has requested an
accommodation.  *Id.* at 108-09; *see Russell* v. *Cooley Dickinson
Hosp., Inc.*, 772 N.E.2d 1054, 1065 (Mass. 2002); *see also* 29

---

*Jensen* v. *Frank*, 912 F.2d 517, 522 (1st Cir. 1990)); *Phillips* v.
*City of Methuen*, 818 F. Supp. 2d 325, 330 (D. Mass. 2011).  If
any of the discrete acts "standing alone is of 'sufficient
permanence' that it should trigger an 'awareness of the need to
assert one's rights,'" then the serial violation exception is
not available.  *Phillips*, 818 F. Supp. 2d at 330 (quoting
*O'Rourke* v. *City of Providence*, 235 F.3d 713, 731 (1st Cir.
2001)).  A denial of a request for accommodation or of a request
for leave constitutes a discrete act "which should have prompted
[the plaintiff] to assert [her] legal rights."  *Williams*, 59 F.
Supp. 3d at 242 (quoting *Phillips*, 818 F. Supp. 2d at 331); *see
Tobin*, 553 F.3d at 130-31; *Ocean Spray Cranberries, Inc.* v.
*Mass. Comm'n Against Discrimination*, 808 N.E.2d 257, 268-69
(Mass. 2004).  This is precisely the type of conduct Kahriman
alleges regarding pre-August 22, 2009 conduct by the defendants.
Accordingly, the serial violation exception would not be
available to her.

C.F.R. § 1630.2(*o*)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.").

The scope of the interactive process required is not defined in detail by the statutes, regulations, or case law, but is generally understood to mean that at a minimum, the employer must engage in an informal conversation with the employee to uncover "potential reasonable accommodations" that could address the employee's needs.  *See Tobin*, 433 F.3d at 109 (quoting 29 C.F.R. § 1630.2(*o*)(3)); *see also Equal Emp't Opportunity Comm'n* v. *Kohl's Dep't Stores Inc.*, 774 F.3d 127, 132 n.4 (1st Cir. 2014) ("an employer's participation in the interactive process [is not] an absolute requirement under the ADA"; rather, employer must "initiate . . . a dialogue" with employee, and court will review adequacy "on a case-by-case-basis" (citation omitted));  29 C.F.R. § 1630.2(*o*)(3) ("This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.").

Kahriman first argues that Wal-Mart's written policies are misleading and unlawful on their face.  Specifically, she argues that the Accommodation Policy uses language that makes a

16

misleading distinction between "disability" and "medical condition" that could lead Wal-Mart managers incorrectly to consider qualified handicapped employees as having a "medical condition" rather than a "disability."  She suggests that such a misleading definition undermines the interactive process.  This argument is unavailing.  The policy defines "disability" in a manner consistent with the definition under the ADA.  *See* 42 U.S.C. § 12102.

Moreover, on its face, the policy does not deprive individuals of an informal interactive process, regardless of whether they are classified as having a disability or a medical condition.  The policy states that if an employee has a medical condition that requires the employee to obtain assistance in performing the essential functions of his or her job, he or she may request an accommodation.  Upon making such a request, "Wal-Mart will begin working with [the employee] to determine whether or not [he or she is] eligible for a job aid or environmental adjustment due to [his or her] medical condition."  An employee with a medical condition may alternatively be eligible for a leave of absence, or may transfer to another open position. Although there is some language in the policy that suggests that Wal-Mart may seek to provide a job aid or environmental adjustment before providing a reasonable accommodation, that

language is not at odds with what the ADA requires or with the concept of an interactive process.  The policy expressly provides that "[i]f your requested accommodation is not granted as a job aid or environmental adjustment, you will be considered for reasonable accommodation."

Kahriman also argues that under the Transfer Policy — before terminating them — Wal-Mart gives employees thirty days to find an alternate position after they have requested an accommodation.[9]  The language Kahriman cites governs the timing and process for when an employee seeks a transfer, including to accommodate a disability, but the policy does not itself require employees who need accommodations to transfer.  In addition, the provision Kahriman cites in the Transfer Policy falls under a section entitled "Transferring from a Field Location to the Home Office," and applies only to transfers "from a field location to a Home Office position or from a field position to another field location."  It therefore does not by terms apply when an

---

[9] Kahriman specifically references the following language in the Transfer Policy: "Associates seeking to transfer from a field location to a Home Office position or from a field position to another field location may be placed on a 30-day unpaid leave of absence after leaving their original position to find another position.  After the 30 day time period has been exhausted and the Associate has not found a position, his or her employment will be terminated.  The sending location will be responsible to follow up with the Associate regarding the status of their transfer and continued employment."

employee seeks to transfer to another position within the same store. Kahriman's argument that this isolated provision of the Transfer Policy, standing alone, denies employees who request reasonable accommodations of the interactive process required by law is unsupported.

In short, Wal-Mart's formal policies do not violate the ADA on their face. *Compare Stillwell* v. *Kansas City, Mo. Bd. of Police Comm'rs*, 872 F. Supp. 682, 684-85 (W.D. Mo. 1995) (policy denying licenses to be armed security guard to applicants with only one hand "discriminates against potentially qualified individuals with disabilities" and has no credible rationale); *Galloway* v. *Superior Court of D.C.*, 816 F. Supp. 12, 16, 20 (D.D.C. 1993) (policy excluding all blind persons from jury duty violates ADA because blind people are "otherwise qualified" to sit on jury).

In the alternative, Kahriman argues that Wal-Mart had a discriminatory practice of not engaging in the interactive process. A systemic violation can arise from "a de facto policy in the form of a consistent, recurring practice." *See Megwinoff* v. *Banco Bilbao Vizcaya*, 233 F.3d 73, 76 (1st Cir. 2000). The testimony of human resources employees from Wal-Mart that Kahriman offers in support of this argument, however, does not demonstrate a systemic violation.

19

Rita Weir, a 30(b)(6) witness for Wal-Mart, testified that if an employee could not perform an essential function of her job, Wal-Mart would seek to reassign her to another job, and if another position was not available, the employee would be placed on a leave of absence. If, eventually, a job could not be located for the employee, her employment could be terminated. Weir indicated that this procedure involved an "interactive process" that began with educating employees about how to inform their supervisors when they required an accommodation.

Jennifer Charles, a market human resource manager for nine Wal-Mart stores, including the Lynn store, testified that "[a]ll associates are eligible to request a reasonable accommodation." She indicated that if an associate is not able to perform an essential function of her job, the employee "would be responsible for finding another position in the store," and if she could not, she would go on a leave of absence until she was able to perform the essential functions, or up to a year. At that point, if she was unable to perform the essential functions, she would be terminated.

Similarly, Susan Stewart, a human resources employee in the Lynn store, testified that if an associate could not perform an essential function, she would be placed on leave of absence or transferred to an open position.

20

This testimony does not establish that Wal-Mart had a discriminatory practice regarding reasonable accommodations. It may signal genuine disputes whether Wal-Mart actually assists employees in identifying other positions and whether it follows the letter of its own policies. Such facts may be relevant to whether Wal-Mart violated chapter 151B and the ADA in its interactions with Kahriman. But standing alone, untethered to any specific accommodation requests, these practices are not per se discriminatory. *See Kvorjak* v. *Maine*, 259 F.3d 48, 57 (1st Cir. 2001) ("The law does not require an employer to 'accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous.'" (citation omitted); *García-Ayala* v. *Lederle Parenterals, Inc.*, 212 F.3d 638, 648-50 (1st Cir. 2000) ("the Act does not require employers to retain disabled employees who cannot perform the essential functions of their jobs without reasonable accommodation," but an "unsalaried leave may be a reasonable accommodation required by the ADA"). Even if these practices are not ideal, Kahriman has not demonstrated that they are discriminatory. *Cf. Crowley* v. *L.L. Bean, Inc.*, 303 F.3d 387, 406 (1st Cir. 2002).[10]

---

[10] The defendants argue that the undisputed evidence in the record that Wal-Mart provided Kahriman with accommodations

My discussion of Wal-Mart's official and unofficial policies and practices for providing reasonable accommodations does not impact the merits of Kahriman's claim that she was denied reasonable accommodations during the limitations period. Regardless of the formal or informal policies in place, an employer's actual treatment of a qualified employee will determine whether the employer has satisfied its duties under the ADA and chapter 151B to provide a reasonable accommodation to qualified employees. *See Tobin*, 553 F.3d at 136.  In this context, I conclude only that Kahriman has not met her burden of demonstrating that a discriminatory policy was in effect during her employment at Wal-Mart, such that she may avail herself of the benefits of the continuing violation doctrine to render actionable those claims of discrimination that are otherwise time-barred.  Accordingly, I will grant the defendant's motion for summary judgment on this issue.  Kahriman may not pursue

---

demonstrates that Wal-Mart did not have a discriminatory policy or practice in place.  That Kahriman may have received some accommodations for lifting, including a lifting belt from a member of the personnel department, does not, however, mean that those accommodations were necessarily *reasonable* as the ADA defines the term, or that Wal-Mart engaged in an interactive process with Kahriman to identify them.  Indeed, the core remaining dispute between the parties is whether Kahriman requested and received *reasonable* accommodations under the ADA and chapter 151B.

liability or damages for any alleged acts of discrimination that occurred prior to August 22, 2009.[11]

## C.    *Kahriman's Termination*

The defendants also seek summary judgment on any discriminatory termination claims Kahriman may have under the ADA and chapter 151B in Counts I, II, and IV of her complaint.

The three-part burden-shifting test articulated by the United States Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973), provides the framework for evaluating this claim.  First, the plaintiff must establish a prima facie case of discrimination.  *See Rodriguez-Torres* v. *Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 58 (1st Cir. 2005).  In this case, Kahriman must establish "that (1) [s]he suffers from a disability or handicap, as defined by the ADA and Chapter 151B,

---

[11] Kahriman correctly observes that even if she cannot recover for time-barred acts of discrimination, she may still introduce evidence of such acts as "background evidence" in proving her timely discrimination claims.  *See Ocean Spray*, 808 N.E.2d at 269-70 ("evidence of an employer's previous responses or inaction to an employee's request for accommodation is relevant as background evidence to determine whether subsequent actions by the employee should be understood as requests for accommodation, and whether the employer's response to a subsequent request meets the 'employer's obligation to participate in the interactive process'" (citation omitted)). But such "background evidence" will be subjected to curative instructions and will not be permitted to distract from the jury's necessary focus on alleged acts of discrimination occurring on or after August 22, 2009.

that (2) [s]he was nevertheless able to perform the essential functions of [her] job, either with or without reasonable accommodation, and that (3) [the defendants] took an adverse employment action against [her] because of, in whole or in part, [her] protected disability." *Tobin*, 433 F.3d at 104; *see Ríos-Jiménez* v. *Principi*, 520 F.3d 31, 40-41 (1st Cir. 2008) (articulating same elements as in *Tobin* and adding that plaintiff must also prove that "the employer, despite knowing about the disability, did not acquiesce to a request for a reasonable accommodation by the employee").

If Kahriman creates an inference of discrimination, "the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for its action." *Rodriguez-Torres*, 399 F.3d at 58 (citing *McDonnell Douglas*, 411 U.S. at 802). If the defendants offer such a reason, supported by credible evidence, Kahriman "must then demonstrate that the defendant's proffered reason was pretext for discrimination." *Id.* (citing *Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-47 (2000)). While the defendants have moved for summary judgment on this issue, "[t]he ultimate burden of proving unlawful discrimination rests at all times with [Kahriman]." *Tobin*, 433 F.3d at 105. In conducting this analysis in the summary judgment context, it is not necessary to

24

follow with precision the shifts in production burdens; instead, the focus is "on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." *Fennell* v. *First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996); *see Mesnick* v. *Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991).

For the purposes of this motion, the defendants assume that the plaintiff could make a prima facie case of discrimination through termination, which may be considered an adverse employment action. As a "legitimate, non-discriminatory reason" for the termination, the defendants assert that they received a note from Kahriman's physician indicating that she was unable to work at all, and therefore deemed Kahriman to have terminated her employment voluntarily. If Wal-Mart did receive such a note, Weir – Wal-Mart's 30(b)(6) witness – testified, it would have been Wal-Mart's procedure to interpret the note as "the associate . . . telling us that they're not able to work, and so we would terminate." An employee who is unable to go to work is by terms unable to perform the essential functions of her job, and this can constitute a legitimate reason for termination. *See Ríos-Jiménez*, 520 F.3d at 42; *see also Staffier* v. *Sandoz Pharm. Corp.*, 888 F. Supp. 287, 292 (D. Mass. 1995) (plaintiff's lack of medical clearance to return to work when positions were

25

available was legitimate reason for defendant not to hire plaintiff); *McMillion* v. *Mollenhauer*, No. 3:12-CV-673-TLS, 2014 WL 6809017, at *10 (N.D. Ind. Dec. 2, 2014) ("her inability to work would constitute a legitimate, non-discriminatory reason to terminate her employment"); *Andrews* v. *Staples the Office Superstore East, Inc.*, No. 7:11CV00037, 2013 WL 3324227, at *14 (W.D. Va. July 1, 2013) ("[defendant] has successfully articulated a 'legitimate, nondiscriminatory reason for the adverse employment action'—that [plaintiff] could not work during the busiest period because her doctor told her she could not work in the copy center or at the check-out area.").

Kahriman argues that the factual record does not support the inference that Wal-Mart possessed the purported physician's note at the time it terminated her employment, and accordingly argues that Wal-Mart has not offered affirmative proof that this was the real reason for her termination.[12]  This creates a genuine dispute whether the reason for Kahriman's termination

---

[12] Kahriman's position is supported by Weir's testimony, in which she stated that the note did not appear in Kahriman's medical file or attached to the exit interview form, at least as she reviewed those documents during her deposition.  Weir testified that if Kahriman had given a doctor's note to a manager or to the personnel department, it would have gone in her medical file.  However, in Weir's review, Kahriman's personnel file did not contain any of the medical records or doctor's notes at issue in this case.

was the receipt of the physician's note stating she was "unable
to work period."  *See Wheelock Coll.* v. *Mass. Comm'n Against
Discrimination*, 355 N.E.2d 309, 314 (Mass. 1976) (employer "must
produce credible evidence to show that the reason or reasons
advanced were the real reasons").  But this dispute is
immaterial.

The plaintiff bears the twofold burden of proving "that the
stated reason behind the adverse employment decision is not only
a sham, but a sham intended to cover up the proscribed type of
discrimination."  *Laurin* v. *Providence Hosp.*, 150 F.3d 52, 58
(1st Cir. 1998).  Even if a reasonable fact finder could
conclude that Wal-Mart had not actually received the physician's
note, Kahriman has not pointed to any evidence that would permit
a fact finder to conclude that her ultimate formal termination
was discriminatory.  *Cf. Feliciano de la Cruz* v. *El Conquistador
Resort & Country Club*, 218 F.3d 1, 8 (1st Cir. 2000); *Thomas*,
183 F.3d at 64 ("even the most blatant unfairness cannot, on its
own, support a Title VII claim").  Kahriman, who concededly
failed to report for work, has not carried her burden of
presenting evidence permitting an inference that Wal-Mart was
"dissembling to cover up a discriminatory purpose."  *Reeves*, 530
U.S. at 147.  There is a plausible, legitimate reason for her
formal termination, regardless of whether it was made known to

Wal-Mart at the time by the physician's note.[13]  *See McKennon* v. *Nashville Banner Pub. Co.*, 513 U.S. 352, 359 (1995) (discussing *Mt. Healthy City Sch. Dist. Bd. of Educ.* v. *Doyle*, 429 U.S. 274, 284-287 (1977)).  Accordingly, I will grant the defendant's motion for summary judgment as to any traditional discriminatory termination claim under Counts I, II, and IV of the complaint.

Granting summary judgment for the defendants on a traditional termination claim, however, does not preclude Kahriman from recovery.  Kahriman has alleged, at a minimum, that the defendants failed to provide her with a reasonable accommodation; this remains a possible basis to hold Wal-Mart liable under the ADA and chapter 151B, and Devuono liable under chapter 151B.  *See Carroll* v. *Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (plaintiff can make prima facie case of discrimination by showing that employer "despite knowing of [employee's] alleged disability, did not reasonably accommodate

---

[13] According to the undisputed facts, Kahriman was on unpaid leave from September 23, 2009 until February 4, 2010, the date of her official termination.  This leave period of over four months clearly exceeds the twelve weeks of unpaid, job-protected leave afforded by the Family and Medical Leave Act (FMLA).  *See* 29 C.F.R. § 825.200.  It is well-settled that an employer need not provide an indefinite leave of absence as a reasonable accommodation.  *Russell* v. *Cooley Dickinson Hosp., Inc.*, 772 N.E.2d 1054, 1064 (Mass. 2002) (collecting cases).  Kahriman's exhaustion of FMLA leave and inability to return to work would be a legitimate reason for terminating her employment.

it"). Granting summary judgment for the defendants on this issue simply narrows the potential bases of liability to be presented at trial.

Kahriman also suggests a constructive discharge claim as a basis for liability. In essence, Kahriman argues that the defendants' disregard of her requests for accommodation through its policies and actions, and the statements of Devuono and other supervisors that she should look for another job if she could not perform her responsibilities, rendered her working conditions intolerable, caused her injury, and rendered her totally disabled, such that she was constructively discharged from her employment.

A constructive discharge claim typically requires the plaintiff to have resigned, and Kahriman has stated explicitly that she did not formally do so. *See Penn. State Police* v. *Suders*, 542 U.S. 129, 133 (2004) (to establish constructive discharge, plaintiff "must show that the abusive work environment became so intolerable that her resignation qualified as a fitting response"). However, the First Circuit recognizes a form of constructive discharge "when an employer effectively prevents an employee from performing his job." *Sanchez* v. *Puerto Rico Oil Co.*, 37 F.3d 712, 719 (1st Cir. 1994); *see Vega* v. *Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir. 1993)

(constructive discharge can result from employment actions that
"result in work so arduous or unappealing, or working conditions
so intolerable, that a reasonable person would feel compelled to
forsake his job rather than to submit to looming indignities");
*see also Hurley-Bardige* v. *Brown*, 900 F. Supp. 567, 572-73 (D.
Mass. 1995) ("the First Circuit adheres to a more lenient
standard under which an employee need only prove that a
reasonable person would have resigned as a result of workplace
conditions.").

Although in some cases, constructive discharge is a means
of proving termination, in others — such as where the end result
is not termination but an inability to perform one's job, or to
be forced to function in a job vastly different from or inferior
to the one the employee previously had — it may be a means to
assert a discrete claim different from traditional
discriminatory termination.  *Cf. Fisher* v. *Town of Orange*, 885
F. Supp. 2d 468, 477 (D. Mass. 2012) (acknowledging different
requirements for stating constructive discharge claim versus
discriminatory termination claim); *Luciano* v. *Coca-Cola Enters.,
Inc.*, 307 F. Supp. 2d 308, 320 (D. Mass. 2004) ("Alleging
constructive discharge [as opposed to actual discharge] presents
a 'special wrinkle' that amounts to an additional prima facie
element").  Kahriman's constructive discharge claim is

30

inextricably linked to her failure to accommodate claims, which cannot be resolved on summary judgment, and is also linked to the *Faragher-Ellerth* defense the defendants have preserved in response to such claims. *See Faragher* v. *City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742 (1998); *Chaloult* v. *Interstate Brands Corp.*, 540 F.3d 64, 73-74 (1st Cir. 2008) (under *Faragher-Ellerth* defense, employer will not be subject to vicarious liability for conduct of supervisor if "its own actions to prevent and correct harassment were reasonable" and "employee's actions in seeking to avoid harm were not reasonable"). In this case, the evidence of record makes it possible to separate the constructive discharge claim from the traditional discriminatory termination claim. Accordingly, Kahriman may pursue the constructive discharge claim.

## IV. CONCLUSION

For the reasons set forth above, I GRANT the defendants' motion for partial summary judgment, Dkt. No. 54, except to the extent that the plaintiff may pursue a constructive discharge claim.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

31